The appellees, in this case, which was an appeal from the High Court of Chancery, were permitted to sue in forma jjauperis. The appellant, being about to send them out of the State, a -writ of ne exeat was obtained from the Chancellor, on the ground that they were entitled to freedom. — In their bill, they asserted this right as having been descended, in the maternal line, from a free Indian woman ; but their genealogy was very imperfectly stated. The time of the birth of the youngest was established by the testimony ; and the characteristic features, the complexion, the hair and eyes, were proven to have been the same with those of whites. Their genealogy was traced back by the evidence taken in the cause, (though different from that mentioned in the bill,) through female ancestors, to an old Indian called Butterwood Nan. One of the witnesses who had seen her, describes her as an old Indian. Others prove, that her daughter Hannah had long black hair, was of the right Indian coj> per colour, ami was generally called an Indian by the neighbours, who said she might recover her freedom, if she would sue for it ; and all those witnesses deposed that they had often seen Indians. Another witness, (Robert Temple,) whose deposition was taken on the part of appellant, proves that the father of Butterwood Nan was said to have been an Indian, but he is silent as to her mother.
On the hearing, thelate chancellor, perceiving from his own view, that the youngest of the appellees was perfectly white, and that there were gradual shades of difference in colour between the grand-mother, mother, and grand-daughter, (all of whom were before the court,) and considering the evidence in the cause, determined that the appellees were entitled to their freedom; and, moreover, on the ground that freedom is the birthright of every human being, which sentiment is strongly inculcated by the first article of our “ political catechism,” the bill of rights —he laid it down as a general position, that whenever one person claims to hold another in slavery, the onus probandi lies on the claimant.
Randolph, for the appellant. The ground on which the appellees claim their freedom, is, that they are lineally descended from a free Indian woman. On the other side, it is contended, that they are descended from a negro woman by an Indian. Although the circumstance of their being white operated on the mind of the Chancellor, who decreed their freedom ; yet as the whole of the testimony proved 'x'them to have been descended from a slave, the presumption on which that decree was- founded must fail.
Whether they are white or not, cannot appear to this Court from the record. They have asserted their right to freedom on very different grounds; and have not, in their evidence, made out the genealogy stated in their bill.
If they could derive their descent from Indians in the maternal line, still it will be found, from the evidence, that their female ancestor was brought into this country between the years 1679 and 1705, and under the laws then in force, might been have a slave.
JUDGE TUCKER.
Is not that a mistake ? The act of 1705, in the clause which respects a free trade with all Indians whatsoever, is a literal transcript from an act of 1691 ; the title of which is preserved in the edition of 1733. (2)
*72 Randolph. In all the cases decided by this Court on the present question, the act of 1705 has been considered as restricting the right of making slaves of Indians: and those cases are authority with me.
George K. Taylor, for the appellees. This is not a common case of mere blacks suing for their freedom; but of persons perfectly white. The peculiar circumstances under which the bill was drawn, will readily account for any inaccuracies which may appear in stating the genealogy of the appellees. But would it have been prudent, or even necessary, to delay the cause, by an amended bill ?
He then took a circumstantial view of the evidence, and inferred, that it clearly proved the appellees to have descended from an Indian stock : all the witnesses deposed to the fact that the female ancestor under whom they claimed was “ of the right Indian copper colour,” with long black hair ; that she was called an Indian in her master’s family, and by the neighbours generally, who said she might get her freedom, if she would sue for it; and many of them had often seen Indians. What more than strong characteristic features would be required, to prove a person white ?
If, in fact, the appellees are descended from Indians, it is incumbent on the appellant to prove that they are slaves ; the appel-lees are not bound to prove the contrary.
From the beginning of the world till the year 1679, all Indians were, in- fact as well as right, free persons. In that year an act passed declaring Indian prisoners taken in war to be slaves : and in 1682, another, that Indians sold to us *by neighbour-inglndians and others trading with us should be slaves. These acts remained in force (till 1691, as supposed by one of the Judges, or at farthest) till 170S, when it has been decided they were repealed.
As all Indians were free, except those brought into this country within the periods and under the circumstances just mentioned, the appellant must bring the appellees within those exceptions, to be entitled to their services as slaves. — Not a case can be shewn from the books, where a person claiming under an exception must not bring himself within it. This is the law with respect to the act of limitations, and many others.
Having proved the descent of the appellees to have been from Indians, as he conceived, he then undertook to prove, from the course of nature, and the early periods at which Indians, unrestrained by a sense of modesty, propagate their species, that the appellees, by ascent, could trace their genealogy back to Indians, who must have been brought into this country since the year 1705.
Randolph, in reply. The circumstance of the appellees’ being white, has been mentioned, more to excite the feelings of the Court as men, than to address them as Judges.
In deciding upon the rights of property, those rules which have been established are not to be departed from, because freedom is in question. The allegata et probata ought surely to be attended to ; as the appellant has not had an opportunity of answering the pedigree stated in the bill. But if he were compelled to go into evidence, without regard to the allegations of the bill, he was prepared to shew that the weight of it was with the appellant.
He then endeavoured to shew, from the testimony, that the original Indian stock from which the appellees descended, was derived from the paternal line. They are bound to prove that they are descended from a free Indian woman. It has been uniformly decided in this Court, that the maternal line must be established before the onus pro-ban di is thrown on the other side.
Curia advisare vult.
Tuesday, November 11. The Judges delivered their opinions.
JUDGE) TUCKER.
In this case, the paupers claim their freedom as being descended from Indians entitled to their freedom.
They have set forth their pedigree in the bill, which the evidence proves to be fallacious. But as there is no Herald’s Office in this country, nor even a Register of births for any but white persons, and those Registers are either all lost, or of all records probably the most imperfect, *our Legislature, even in a writ of praecipe quod reddat, has very justly dispensed with the old common law precision required in a writ of right, and the reason for dispensing with it in the present case, is a thousand times stronger. In a claim for freedom, like a claim for money had and received, the plaintiff may well be permitted to make out his case on the trial according to the evidence.
What then is the evidence in this case? Unequivocal proof adduced perhaps by the defendant; that the plaintiffs are in the maternal line descended from Butterwood Nan, an old Indian woman; — that she was 60 years old, or upwards, in the year 1755;— that it was always understood, as the witness Robert Temple says, that her father was an Indian, though he cautiously avoids saying he knew, or ever heard, who, or what, her mother was. The other witness Mary Wilkinson, the only one except Robert Temple who had ever seen her, describes her as an old Indian : and her testimony is strengthened by that of the other witnesses, who depose that her daughter Hannah had long black hair, was of a copper complexion, and generally called an Indian among the neigh-bours ; — a circumstance which could not well have happened, if her mother had not had an equal, or perhaps a larger portion of Indian blood in her veins. As the rule partus sequitur ventrem obtains in this country, the deposition of Robert Temple as to who was reputed to be the father of Butterwood Nan, without noticing her mother, is totally irrelevant to the cause. It could not serve the complainant, a fortiori it shall not prejudice her. It was, perhaps, intended as a sort of negative pregnant. But it has not even the tithe of that importance in my estimation.
In aid of the other evidence, the Chancellor decided upon his own view. This, with the principles laid down in the decree, has been loudly complained of..
As a preliminary to my opinion upon this subject, I shall make a few observations upon the laws of our country, as connected with natural history.
From the first settlement of the colony of *73 Virginia to the year 1778, (Oct. Scss.) all negroes, Moors, and mulattoes, except Turks and Moors in amity with Great Britain, brought into this country by sea, or by land, were slaves. And by the uniform declarations of our laws, the descendants of the females remain slaves, to this day, unless they can prove a right to freedom, by actual emancipation, or by descent in the maternal line from an emancipated female. : i . .
By the adjudication of the General Court, in the case of Hannah and others ; against Davis, April term, 1777, all * American Indians brought into this . , country since the year 1705, and their descendants in the maternal line, are free. Similar judgments have been rendered in this court, (a) But I carry the period further back, via. to the 16th day of April, 1691, the commencement of a session of the General Assembly at which an act passed, entituled “An Act fora free trade with Indians,” the title of which (chap. 9,) will be found in the edition of 1733, p. 94: And the enacting clause of which, I have reason to believe, is in the very words of the act of 170S, upon which this Court have pronounced judgment in the cases referred to. • , • ; [ : l : i ' [
I will here mention those reasons. On the trial of a similar question on the Eastern shore, two copies of Purvis’s edition of the laws of Virginia, were produced. At the end of both was added a manuscript transcript of all the acts of Assembly subsequently passed for a series of years ; the titles, number of chapters, &c. perfectly agreeing with the titles, number and order in which they are printedin the edition of 1733. In one of these copies, (both evidently of ancient date, and as I think both attested by the secretary of the colony,(1) I found the enacting clause in the same precise words, as they stand in the act of 1705. (2) In the other copy, the leaf on which the act must have been transcribed, was with one, or at most two others, evidently torn out: probably with a view to hide the act from the scrutinizing eye of a Court. I think it highly probable, that at that period, the County Courts were furnished with the laws of the colony in this mode ; there being at that time no printing presses in Virginia, Purvis’s collection being printedin England. I have myself a mutilated copy of the same character and description ; but those in whose possession it had been, had torn out almost a hundred pages at the beginning, and so many at the end as not to leave the act in question, before I became possessed of it. These are my reasons for referring the commencement of the law in question to so remote a period ; for the acts of 1705, were like those of 1792, a digest of the former laws of the col- ; i ; I ' 1 : : : : . : : . : : ony, rather than a new *code. — By an act passed in the year 1679, it was, for the better encouragement of soldiers, declared that what Indian prisoners should be taken in a war in which the colony was then engaged should be free purchase to the soldier : taking them. In 1682, it was declared that i all servants brought into this country, by sea . or land, not being Christians, whether . negroes, Moors, mulattoes, or Indians, except Turks and Moors in amity with Great Britain ; and all Indians which should thereafter be ; sold by neighbouring Indians, or any others . trafficking with us, as slaves, should be slaves , to all intents and purposes. The General • Court held, (and I presume this Court, consisting nearly of the same judges, have done , the same,) that the passing the act authoris- • ing a free and open trade for all persons, at ; all times, and at all places, with all Indians whatsoever, did repeal the acts of 1679 and [ 1682. I concur most heartily in that opinion ; : referring the commencement of that act to l 1691 instead of 1705, for the reasons tnen- : tioned. Consequently I draw this conclu-i sion, that all American Indians are prima ' facie free : and that where the fact of their [ nativity and descent, in a maternal line, is satisfactorily established, the burthen of ; proof thereafter lies upon the party claiming i to hold them as slaves. To effect which, ; according to my opinion, he must prove the I progenitrix of the party claiming to be free, ' to have been brought into Virginia, and 1 made a slave between the passage of the act : of 1679, and its repeal in 1691.
: All white persons are and ever have been : free in this country. If one evidently white, : be notwithstanding claimed as a slave, the . proof lies on the party claiming to make the : other his slave.
: Though I profess not an intimate acquaint- . anee with the natural history of the human : species, I shall add a few words on the subject as connected with the preceding laws.
Nature has stampt upon the African and his : descendants two characteristic marks, besides the difference of complexion, which often remain visible long after the characteristic distinction of colour either disappears or becomes doubtful; a flat nose and woolly head of hair. The latter of these characteristics disappears the last of all : and so strong an ingredient in the African constitution is this latter character, that it predominates uniformly where the party is in equal degree descended from parents of different complexions, whether white or Indians ; giving ‘ to the jet black lank hair of the Indian a degree of flexure, which never fails to betray that the party distinguished by it, cannot trace his lineage purely from the race of native Americans. Its operation *is still more powerful where the mixture happens between persons descended equally from European and African parents. So pointed is this distinction between the natives of Africa and the aborigines of America, that a man might as easily mistake the glossy, jetty cloathing of an American bear for the wool of a black sheet), as the hair of an American Indian for that of an African, or the descendant of an African. IT pon these distinctions as connected with our laws, the burthen of proof depends. Upon these distinctions not unfrequently does the evidence given upon trials of such questions depend ; *74 as in the present case, where the witnesses concur in assigning- to the hair of Hannah, the daughter of Butterwood Nan, the long, .straight, black hair of the native aborigines of this country. That such evidence is both admissible and proper, I cannot doubt. That it may at sometimes be necessary for a Judge to decide upon his own view, I think the following case will evince.
Suppose three persons, a black or mulatto man or woman with a flat nose and woolly head; a copper-coloured person with long jetty black, straight hair; and one with a fair complexion, brown hair, not woolly nor inclining thereto, with a prominent Roman nose, were brought together before a Judge upon a writ of Habeas Corpus, on the ground of false imprisonment and detention in slavery: that the only evidence which the person detaining them in his custody could produce was an authenticated bill of sale from another person, and that the parties themselves were unable to produce any evidence concerning themselves, whence they came, &c. &c. How must a Judge act in such a case? I answer he must judge from his own view. He must discharge the white person and the Indian out of custody, taking surety, if the circumstances of the case should appear to authorise it, that they should not depart the state within a reasonable time, that the holder may have an opportunity of asserting and proving them to be lineally descended in the maternal line from a female African slave ; and -he must redeliver the black or mulatto person, with the flat nose and woolly hair to the person claiming to hold him or her as a slave, unless the black person or mulatto could procure some person to be bound for him, to produce proof of his descent, in the maternal line, from a free female ancestor. — But if no such caution should be required on either side, but the whole case be left with the Judge, he must deliver the former out of custody, and permit the latter to remain in slavery, until he could produce proofs of his right to freedom. This case shews my interpretation how far the onus *probandi may be Shifted from one party to the other: and is, I, trust, a sufficient comment upon the case to shew that I do not concur with the Chancellor in his reasoning on the operation of the first clause of the Bill of Rights, which was notoriously framed with a cautious eye to this subject, and was meant to embrace the case of free citizens, or aliens only ; and not by a side wind to overturn the rights of property, and give freedom to those very people whom we have been compelled from imperious circumstances to retain, generally, in the same state of bondage that they were in at the revolution, in which they had no concern, agency or interest. But notwithstanding this difference of opinion from the Chancellor, I heartily concur with him in pronouncing the appellees absolutely free ; and am therefore of opinion that the decree be affirmed.
JUDGE} ROANE.
The distinguishing characteristics of the different species of the human race are so visibly marked, that those species may be readily discriminated from each other by mere inspection only. This, at least, is emphatically true in relation to the negroes, to the Indians of North America, and the European white people. When, however, these races become intermingled, it is difficult, if not impossible, to say from inspection only, which race predominates in the offspring, and certainly impossible to determine whether the descent from a given race has been through the paternal or maternal line. In the case of a Propositus of unmixed blood, therefore, I do not see but that the fact may be as well ascertained by the Jury or the Judge, upon view, as by the testimony of witnesses, who themselves have no other means of information : — but where an intermixture has taken place in relation to the person in question, this criterion is not infallible ; and testimony must be resorted to for the purpose of shewing through what linea descent from a given stock has been deduced ; and also to ascertain, perhaps, -whether the colouring of the complexion has been derived from a negro or an Indian ancestor.
In the case of a person visibly appearing to be a negro, the presumption is, in this country, that he is a slave, and it is'incumbent on him to make out his right to freedom : but in the case of a person visibly appearing to be a white, man, or an Indian, the presumption is that he is free, audit is necessary for his adversary to shew that he is a slave.
In the present case it is not and cannot be denied that the appellees have entirely the appearance of white people : and how does the appellant attempt to deprive them of the blessing of liberty to which all such persons are entitled? He ^brings no testimony to shew that any ancestor in the female line was a negro slave or even an Indian rightfully held in slavery. Eength of time shall not bar the right to freedom of those who, prima facie, are free, and whose poverty and oppression, (to say nothing of the rigorous principles of former times on this subject,) has prevented an attempt to assert their rights. But in the case before us, there has .been no acquiescence. It is proved that John, (a brother of Hannah,) brought a suit to recover his freedom ; and that Hannah herself made an almost continual claim as to her right of freedom, insomuch that she was threatened to be whipped by her master for mentioning the subject. It is also proved by Francis Temple (perhaps the brother of Robert) that the people in the neighbourhood said “ that if she would try for her freedom she would get it.” This general reputation and opinion of the neighbourhood is certainly entitled to some credit: it goes to repel the idea that the given female ancestor of Hannah was a lawful slave ; it goes to confirm the other strong testimony as to Hannah’s appearance as an Indian. It is not to be believed but that some of the neigh-bours would have sworn to that concerning which they all agreed in opinion ; and, if so, Hannah might, on their testimony, have perhaps obtained her freedom, had those times been as just and liberal on the subject of slavery as the present.
No testimony can be more complete and conclusive than that which exists in this cause to shew that Hannah had every appearance of an Indian.
That appearance, on the principle with-which I commenced, will suffice for the claim *75 of her posterity, unless it is opposed by counter-evidence shewing that some female ancestor of her’s was a negro slave, or that she or some female ancestor, was lawfully an Indian slave. As to the first, there is no kind of testimony going to establish it. Robert Temple is not only entirely silent as to the colour and appearance of the mother of Nan, the mother of Hannah, but also as to that of Nan herself, The testimony of this witness (to say nothing of his probable interest in the question) is not satisfactory. His memory seems only to serve him so far as the interest of the appellant required. If Hannah’s grandmother (the mother of Nan) were a negro, it is impossible that Hannah should have had that entire appearance of an Indian which is proved by the witnesses. — If they tell the truth, therefore, Hannah’s grandmother was not a negro slave. This is more especially the case, if the father of Hannah were other than an Indian, and it is not *proved nor can be presumed, that, in this country, at that time, her father was an Indian : in that case, Hannah would have had so little Indian blood in her veins, as not to justify the character of her appearance given by the witnesses. The mother and grandmother of Hannah must therefore be taken to have been Indians: but this will not suffice for the appellant unless they (or one of them) be shewn to have been Indian slaves.
This Court in the case of Coleman v. Dick and Pat,(a) was of opinion that, since the year 170S, no American Indian could be reduced to a state of slavery : and if the act of 1705 had been previously enacted in 1691, as it would seem by the information of the manuscript act given by the Judge who preceded me, the epoch on this subject would be carried back to that year ; which would completely overreach the date of the birth of old Nan and exclude every possibility of doubt on the subject. But, even under the act of 1705, the calculations and inductions of the appellees’ counsel have entirely satisfied me that Nan could not have been brought into this country prior thereto. The Chancellor was, and we are now in the place of a Jury : we have more power than the Court had in the case of Coleman v. Dick and Pat, who were acting upon a special verdict; and I will not only presume that Nan (if brought into this country, which, however, is not shewn to have been the case) was an American Indian, but was brought in posterior to the year 1705.
But this is taking a stronger ground than is necessary to sustain the claim of the appel-lees : the appellant to prevail in this cause must shew, on his part, that Nan, or some other female ancestor was brought into this country at a time, and under circumstances, which created a lawful right, under the then existing laws, to hold her and her posterity in slavery.
As to the variance in this instance between the case made by the evidence, and that stated in the bill, there is nothing in it. The liberality admitted in suits for freedom by this Court will certainly justify the appellees in meeting the appellant on the ground he has taken, which they contend, and will establish by the judgment of this Court, will suffice to justify their claim to freedom.
Iam therefore of opinion1 that the appel-lees, on these grounds, are entitled to their freedom, and that the decree ought to be affirmed.

 See Tucker’s Blackslone, vol. 1, part 2, note to Appendix, p. 47.

 1 Wash. 123; Jenkins v. Tom. Tbid. 239; Coleman v. Dick and Pat.

 The attestation of these acts was stated from memory. Since delivering' the above opinion, I have seen another copy of Purvis's collection of the Laws, to which is subjoined a continuation of the acts of Assembly, in manuscript, for two succeeding sessions, but not as far down as the act of 1691. The acts of each of those sessions are attested by the Clerk of the Assembly; which may probably be the case with those to which I have before alluded. —Note in Original Edition.

 See a note to the case of Pallas, Bridget and others v. Hill and others, in vol. 2, where an account of the discovery of the several MS. acts of Assembly on this subject, is given. — Note in Original Edition.

 1 Wash. 233.